**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NEWPAGE CORPORATION, *et al.*, | ) | Case No. 11-12804 (KG) |
| | ) | |
| Debtors. | ) | |
| | ) | |
| PIRINATE CONSULTING GROUP, LLC | ) | |
| AS LITIGATION TRUSTEE OF THE NP | ) | |
| CREDITOR LITIGATION TRUST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Adv. Pro. No. 13-52206 (KG) |
| | ) | |
| MARYLAND DEPARTMENT OF THE | ) | |
| ENVIRONMENT, | ) | |
| | ) | |
| Defendant. | ) | **Re: Dkt. Nos. 36 & 39** |
| | ) | |

## MEMORANDUM OPINION

### OVERVIEW

Pirinate Consulting Group, Litigation Trustee (the "Trustee") for the NP Creditor

Litigation Trust, has filed an avoidance action against the Maryland Department of the

Environment ("MDE") and seeks to avoid three separate payments as preferences under section

547(b) of the U.S. Bankruptcy Code (the "Code"). Both parties have moved for summary

judgment (the "Motions"), and there are seven (7) issues ripe for adjudication. For the following

reasons, the Court will grant MDE's motion and, accordingly, deny the Trustee's motion.

### FACTS

There are no disputes of material fact. The Debtors' subsidiary, Luke Paper Company

operates a mill (the "Luke Mill") in Maryland that is regulated by various divisions of MDE. *See*

Declaration of Karen Irons ("Irons Declaration"), ¶ 4.  The full extent of the relationship between the Debtors and MDE is somewhat unclear.  However, MDE notes that "the State's operating permit program has been in place for decades" and that the Debtors have "been paying the emissions based fee of the type at issue in this case . . . at least since 1997." *Id.*  Here, the Trustee seeks to avoid three separate fees paid to MDE.

Under Maryland law, all entities that operate "fuel-burning equipment, statutory combustion turbines, or . . . wood digesters" must obtain a permit to operate in the state.  Irons Declaration, ¶ 1.  Accordingly, the Debtors would remit an annual permit-to-operate fee (the "Permit Fee") in order to maintain their license.  Irons Declaration, ¶ 4.  The Permit Fee is calculated based upon each ton of regulated emissions.  Def.'s Br. ¶ 3.  More specifically, the applicable Maryland statute provides that the fee is calculated based upon a "base fee of $200.00 plus an emission-based fee for each ton of regulated emissions from all installations at the plant or facility." *Id.* (citing Code of Maryland Regulations 26.11.02.19A).  On July 6, 2011, the Debtor delivered or caused to be delivered the Permit Fee in the amount of $1,597,584. *See* Irons Declaration, Ex. 8.  The Debtors have been paying the Permit Fee since at least 2007, and the amount of the fee has ranged from $328,047 to $1,597,584 in 2011.  Irons Declaration, Ex. 1.  MDE has provided payment data on the Permit Fees from 2007 to present. *Id.* at ¶ 6.

The State of Maryland also requires an entity to apply for an asbestos license before it "engages in any asbestos removal or encapsulation."  Declaration of Lorraine Anderson ("Anderson Declaration"), ¶ 4.  The renewal fee (the "Asbestos Fee") is fixed at $750 annually, and failure to remit payment results in automatic revocation of the license. *See, e.g*, Anderson Declaration, Ex. 1 (letter to Debtors).  On July 4, 2011, the Debtors delivered or caused to be delivered its Asbestos Fee for 2011.  Anderson Declaration, Ex. 2.  Ms. Anderson, Chief of the

Asbestos Division, Air Quality Compliance Program, Air and Radiation Management Administration of MDE, attaches a record detailing "the asbestos removal/encapsulation license renewal history for Luke Paper Company since July 14, 1999."  Anderson Declaration, ¶ 5(m). Moreover, in order to renew the asbestos license, MDE routinely sent the Debtors a letter notifying them that in order to renew its license for an additional one-year term, it was obligated to remit a $750 payment by a certain date.  Anderson Declaration, ¶ 5.  MDE has attached copies of these letters and license applications from 2009 to present.  *Id.*

Finally, Maryland's Community-Right-to-Know law mandates that any entity required by the Federal Emergency Planning and Community Right to Know Act ("EPCRA") "furnish a report, notice, or any other form of information to the State of Maryland or any of its officers or instrumentalities."  Def.'s Br. ¶ 6.  Such entity must pay an annual fee of $1,000 (the "Report Fee").  *Id.*  On July 7, 2011, the Debtors delivered or caused to be delivered the $1,000 Report Fee.  The Debtors have been paying the Report Fee since at least 2010.  Declaration of Natalie Washington ("Washington Declaration") ¶ 4.

The Trustee seeks to avoid the Debtors' 2011 Permit Fee, Asbestos Fee, and Report Fee (collectively, the "Environmental Fees") as preferential transfers and has moved for summary judgment.  In response, MDE has cross-moved for summary judgment, arguing that the Asbestos Fee was not paid on account of an antecedent debt and that the transfers did not enable it to receive more than it would have in a hypothetical liquidation.[1]  Additionally, MDE asserts three affirmative defenses under section 547(c) of the Code – the contemporaneous exchange defense, the ordinary course of business defense, and the *de minimis* exception.  Additionally, MDE argues that 28 U.S.C. § 959(b) prohibits a trustee from recovering environmental compliance fees.

---

[1] The Debtors only make the "antecedent debt" argument with respect to the Asbestos Fee.

Finally, MDE argues that the doctrine of sovereign immunity insulates it from liability in these proceedings.

A summary of the applicable transfers follows.  *See* Irons Declaration; Anderson Declaration; Washington Declaration.

| | Amount | Payment Delivery Date | Invoice to Payment Time (days) |
|---|---|---|---|
| **Permit Fee** | $1,597,584 | July 6, 2011 | 67 |
| **Asbestos Fee** | $750 | July 4, 2011 | 97 |
| **Report Fee** | $1,000 | July 7, 2011 | 31 |

The documented historical payments follow:

**Permit Fee**

| Amount | Invoice Date | Due Date | Payment Delivery Date | Invoice to Payment |
|---|---|---|---|---|
| $1,597,584 | May 1, 2011 | June 30, 2011 | July 6, 2011 | 67 |
| $1,275,657 | May 1, 2010 | June 30, 2010 | June 17, 2010 | 48 |
| $500,000 | May 1, 2009 | June 30, 2009 | July 6, 2009 | 66 |
| $335,559 | April 28, 2008 | June 30, 2008 | June 26, 2009 | 59 |
| $328,047 | April 30, 2007 | June 30, 2007 | July 2, 2007 | 63 |

**Asbestos Fee**

| Amount | Letter Date[2] | Due Date[3] | Payment Delivery Date[4] | Invoice to Payment |
|---|---|---|---|---|
| $750 | March 31, 2011 | July 29, 2011 | June 27, 2011 | 87 |
| $750 | March 31, 2010 | July 29, 2010 | June 16, 2010 | 77 |
| $750 | March 31, 2009 | July 29, 2009 | June 20, 2009 | 81 |

---

[2] The "invoice date" with respect to the Asbestos Fee is the date upon which MDE sent the letter to the Debtors notifying them that their asbestos license was about to expire.

[3] For purposes of this opinion, the Court will treat the asbestos license expiration date as the due date.

[4] For purposes of this opinion, the "delivery date" is the date upon which MDE received letter and payment from the Debtors notifying them of their intent to renew the asbestos license.

**Report Fee**

| Amount | Invoice Date | Due Date | Payment Delivery Date | Invoice to Payment |
|---|---|---|---|---|
| $1,000 | June 6, 2011 | June 6,  2011 | July 7, 2011 | **31** |
| $1,000 | May 27, 2010 | May 27, 2010 | July 1, 2010 | **35** |

## DISCUSSION

### Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); FED. R. BANKR. P. 7056.  The moving party bears the initial burden of showing that no genuine issue of material fact exists.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  All evidence must be viewed in a light most favorable to the non-moving party.  *Mitsushita Elec. Inuds. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 599 (1986).  Once the moving party has met its initial burden, the burden shifts to the non-moving party to demonstrate that a genuine issue of material fact exists. *Id.* at 585-86.  The "mere existence" of an alleged factual dispute will not defeat a properly supported motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 447 U.S. 242, 247-48 (1986).  The non-moving party "must set forth specific facts showing a genuine issue for trial."  FED. R. CIV. P. 56(e).  Where, as here, there are cross-motions for summary judgment, the Court must ensure that the nonmoving party on each theory has the inferences to be drawn from the underlying facts viewed in the light most favorable to it as the party opposing the motion. *Matsushita*, 475 U.S. at 578-88.

### Overview of Avoidable Preferences

The Bankruptcy Code permits a trustee to recover certain transfers made prior to the petition date. The trustee may avoid any transfer by the debtor:

   (1) to or for the benefit of a creditor;

(2) for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3) made while the debtor was insolvent;

(4) made on or within 90 days before the date of the filing of the petition; and

(5) that enables such creditor to receive more than such creditor would receive if the case were a case under chapter 7 and such transfer had not been made.

11 U.S.C. § 547(b). The trustee bears the burden of proving each of these elements by a preponderance of the evidence. 5 Collier on Bankruptcy ¶ 547.13 (15th ed. 2015).

MDE disputes whether the Trustee established a *prima facie* case to avoid the fees. Specifically, MDE argues that the Asbestos Fee was not paid on account of an antecedent debt. Also, the Environmental Fee transfer did not enable MDE to receive more than it would have received under a chapter 7 liquidation. The Court holds that the Trustee has established a *prima facie* case to avoid the Permit Fee and the Report Fee but not the Asbestos Fee.

### 1.  Antecedent Debt

MDE first argues that because the Asbestos Fee was paid before the Debtors carried any legal obligation to remit such payment, the transfer was not on account of an antecedent debt. A transfer is deemed "on account of an antecedent debt" if the debtor incurs the liability prior to the alleged preferential transfer." 11 U.S.C. § 547(b)(2); *Stanziale v. S. Steel & Supply, L.L.C. (In re Conex Holdings, LLC)*, 518 B.R. 269, 277 (Bankr. D. Del. 2014). More specifically, courts have held that a debt "is deemed to have been incurred on the date upon which the debtor first becomes legally bound to pay." *Conex*, 518 B.R. at 277. Accordingly, the appropriate task for the Court is to determine when the Debtors became legally bound to remit the Asbestos Fee.

Both parties dispute the date upon which the Debtors became legally bound to pay. This disagreement focuses on the letter MDE sent to the Debtors on March 29, 2011, which informed the Debtors about the Asbestos Fee. The Trustee asserts that the letter amounted to an invoice and

6

that the Debtors became legally bound to pay upon receiving such invoice. MDE, on the other

hand, claims that the letter simply notified the Debtors about the Asbestos Permit's approaching

July 29, 2011, expiration date and the optional renewal process. As a result, MDE argues that any

obligation to pay would be triggered upon expiration of the license. The Court therefore must

consider whether the Debtors' obligation to pay was triggered upon receipt of the letter or the

Asbestos Permit's expiration date.

The Court concludes that whether the letter functioned as an invoice is immaterial because

an invoice itself does not create a legal obligation to pay. *See In re First Jersey Securities, Inc.*,

180 F.3d 504, 511 (3d Cir. 1999). Claims create an obligation to pay, *see id.*; and claims arise

when services are performed or goods are transferred, *id.* (holding that claims arise at the outset of

services, "not when the bill itself is presented"), or when parties intend for a debt to be due. *See*

*PN Chapter 11 Estate Liquidating Trust v. Inserts East, Inc. (In re Phila. Newspapers, LLC)*, 468

B.R. 712, 722 (Bankr. E.D. Pa. 2012) (holding parties' intent to make payment "due on receipt"

of the invoice, not the invoice itself, created an antecedent debt).

Here, MDE had no claim for the Asbestos Fee when it received the letter because MDE

did not perform a service. The Debtors' license was still in effect, and the Debtors had already

paid for the right to engage in asbestos removal activities up to the expiration date. Additionally,

the parties' actions did not suggest an intent to create an obligation to pay prior to receipt of

services. Unlike in *First Jersey Securities* where the commencement of legal services created a

claim, MDE performed no work for the Debtors. And as opposed to *Philadelphia Newspapers*

where the parties intended payment to be due upon delivery of an invoice, MDE's letter only

served to inform the Debtor about its license's upcoming expiration date. The Debtors had no

obligation to renew the license before the expiration date. Indeed, the letter explicitly stated that

the Debtors "may" renew its license.   Only if the Debtors continued asbestos removal/encapsulation work past its license's expiration date without paying the fee could MDE assert a claim against the Debtors.  Because MDE had no claims against the Debtors when the Debtors received the letter, a debt was never incurred and thus the license renewal transfer was not on account of an antecedent debt.

## 2.  Hypothetical Liquidation

MDE next argues that the transfers were not preference payments because such payments did not enable MDE to receive more than it would have received in a hypothetical chapter 7 liquidation.  More specifically, MDE contends that the Environmental Fees are administrative expenses, and it therefore would be entitled to a full recovery under both chapter 11 and chapter 7.  In the alternative, MDE argues that the Environmental Fees should be approved under the "doctrine of necessity."

### a.  Administrative Claim

Section 503(b)(1) of the Code provides that "actual, necessary costs and expenses of preserving the estate" shall constitute administrative expenses entitled to priority. 11 U.S.C. § 503(b)(1)(A).  MDE relies on a line of cases for the proposition that environmental compliance costs are "actual and necessary" for the preservation of the estate.  *See, e.g.*, *Cumberland Farms v. Florida Dep't of Envtl. Protection*, 116 F.3d 16, 19 (1st Cir. 1997).  However, these cases all address situations where the debtor was forced to pay a post-petition penalty for its non-compliance with environmental laws.  *See id*. (noting that the failure to pay a "fine" during bankruptcy for the creation of an environmental hazard can constitute an administrative expense).  Courts in this Circuit have held that in order to be considered an administrative expense under section 503(b)(1), the claimant must demonstrate that the "(1)

expense arose from a post-petition transaction between the debtor and (2) the transaction accorded the estate an actual benefit." *In re Insilco Techs., Inc.*, 309 B.R. 111, 114 (Bankr. D. Del. 2004). Here, it is clear that there was no post-petition transaction entered into between the Debtors and MDE.  Moreover, the cases relied upon by MDE are distinguishable because they primarily address post-petition remediation costs pertaining to environmental hazards.  Because the fees sought to be avoided do not pertain to post-petition fines for the creation of an immediate harm to the public, they do not constitute administrative expenses under the Code.

### b.  Doctrine of Necessity

MDE next argues that "to the extent that the fees, had NewPage failed to pay them during the Preference Period, constitute pre-petition claims, it would nonetheless benefit the estate for these fees to be paid." Reply Brief at 15.  MDE claims that because the fees could have been paid on the Petition Date under the "doctrine of necessity," it would have received a full recovery. *Id.* MDE cites no authority for the proposition that a potential first day claim rebuts the requirement of section 547(b)(4).  Even if it were able to do so, however, the Court is not convinced that the Environmental Fees would be appropriate for consideration at a first day hearing.  Under the doctrine of necessity, a debtor may pay a pre-petition creditor when such creditor "will not supply services or material essential to the conduct of the business until [its] pre-reorganization claims shall have been paid." *In re Lehigh & N. E. R. Co.*, 657 F.2d 570, 581 (3d Cir. 1981).  This rule is clearly inapplicable to Environmental Fees as MDE did not supply the Debtors with post-petition goods.  While debtors do often move to pay pre-petition taxes on the first day of the case, no such motion was made in the matter at hand.  Accordingly, the Court must reject MDE's contention that the payments of Environmental Fees fall under the doctrine of necessity.

### 3. Ordinary Course of Business Defense

MDE argues that the transfers are protected by the ordinary course of business defense of

section 547(c)(2).  Section 547(c)(2) of the Code provides:

(c) The trustee may not avoid under this section a transfer —

> (2) to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee, and such transfer was —
>
>> (A) made in the ordinary course of business or financial affairs of the debtor and the transferee; or
>>
>> (B) made according to ordinary business terms.

11 U.S.C. § 547(c)(2).

A defendant can protect a transfer from avoidance by meeting the "subjective" test of

section 547(c)(2)(A) or the "objective" test of section 547(c)(2)(B).  *See SEC v. First Jersey Sec,*

*Inc. (In re First Jersey Sec, Inc.)*, 180 F.3d 504, 512 (3d Cir. 1999); *Jacobs v. Gramercy Jewelry*

*Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, 2010 Bankr. LEXIS 3941, at *2 (Bankr. S.D.N.Y.

Nov. 4, 2010).  Although defendants were previously required to prove both prongs prior to the

BAPCPA Amendments of 2005, the pre-2005 cases interpreting sections 547(c)(2)(A) and

547(c)(2)(B) remain good law.  *M. Fabrikant* 2010 Bankr. LEXIS, at *5 (citing 5 Collier

¶ 547.04[2], at 547-51).  Both the subjective test and the objective test were designed to protect

"recurring, customary credit transactions that are incurred and paid in the ordinary course of

business of the debtor and the debtor's transferee."  7 Collier on Bankruptcy ¶ 547.04[2] (16th ed.

2014).  Here, MDE asserts the subjective defense as it focuses its analysis on the historical

relationship with the Debtors.

When determining if a transfer was "made in the ordinary course of business or financial

affairs of the debtor and the transferee," courts look at a number of factors in order to gain a clearer

understanding of the parties' historical relationship.  *Stanziale v. Indus. Specialists Inc. (In re Conex Holdings, LLC)*, 522 B.R. 480, 487 (Bankr. D. Del. 2014).  These factors include: "(1) the length of time the parties engaged in the type of dealing at issue; (2) whether the subject transfers were in an amount more than usually paid; (3) whether the payments at issue were tendered in a manner different from previous payments; (4) whether there appears to have been an unusual action by the debtor or creditor to collect on or pay the debt; and (5) whether the creditor did anything to gain an advantage (such as additional security) in light of the debtor's deteriorating financial condition."  *Id*.  If a debtor and a transferee have been engaged in a business relationship for a long time, courts can simply compare the historical dealings of the parties with their preference period dealings to determine whether the transfers were made in the ordinary course of business.  *See id*. (citing *Fiber Lite Corp. v. Molded Acoustical Products, Inc. (In re Molded Acoustical Products, Inc.)*, 18 F.3d 217, 224-25 (3d Cir. 1994)).  Indeed one court has noted that "[t]he starting point—and often ending point—involves consideration of the average time of payment after the issuance of the invoice during the pre-preference and post-preference periods, the so-called 'average lateness' computation theory."  *M. Fabrikant & Sons*, 2010 Bankr. LEXIS 3941, at *3.  If the average time to payment changes significantly during the preference period, such transfers will be deemed outside the ordinary course of business and not protected by section 547(c)(2)(A).  *See id.*

There are two legal disputes between the Trustee and MDE with respect to this issue.  First, MDE asserts that the historical period used for the analysis should be five years instead of two years.  Second the Trustee argues that the Environmental Fees should be aggregated for purposes of the ordinary course of business analysis.  The Court believes this dispute to be immaterial as "[t]here is no precise legal test that can be applied in determining whether payments by the debtor

during the 90-day period were made in the ordinary course of business." 7 Collier on Bankruptcy ¶ 547.04[2][a][ii] (16th ed. 2014). Rather, "[t]he controlling factor is whether the transactions between the debtor and the creditor both before and during the 90-day period were consistent." *Id.* Thus, the Court must examine the entire documented history of the Debtors' relationship with MDE. *See, e.g.*, *In re Tolona Pizza Prods. Corp.*, 3 F.3d 1029, 1032 (7th Cir. 1993) (noting that the transfers should "conform to the norm established by the debtor and creditor in the period before, preferably well before, the preference period"). Having articulated this standard, the Court will now examine the five factors addressed in *Conex* in determining whether the transfers conform to such norm.

With respect to the first factor, the length of time the parties engaged in the type of dealing at issue, the record shows that MDE invoiced the Debtors for at least five (5) years prior to the Petition Date. See Irons Declaration, ¶ 6. Additionally, Luke Paper Company has been paying emissions based fees since at least 1997. *Id.* at ¶ 7. The Court holds that five to eighteen years is more than sufficient to establish a lengthy baseline of dealings. While it is true that the number of invoices that comprise this baseline is significantly less than what is typically seen in other preference actions, this lack of volume is made up for by the parties' lengthy relationship. Thus, factor one weighs in favor of MDE.

Factor two, whether the subject transfers were in an amount more than usually paid, also weighs in favor MDE. The Asbestos Fee and the Report Fee were constant throughout the historical period - $750 and $1,000 respectively. *See, e.g.*, Declaration of Lorraine Anderson, ¶ 5. With respect to the Permit Fee, the amount tendered to MDE varied considerably during the five years prior to the Petition Date. *See, e.g.*, Irons Declaration, Exs. 1-9 (showing that the Debtors' Permit to Operate Fees ranged from $328,047 to $1,597,584). However, it makes little sense for

this fact to swing the pendulum in favor of the Trustee as the Permit Fee varies as a matter of Debtors' volume of business and Maryland law. The record indicates that the formula for calculating the Permit Fee remained constant throughout the years, and the Court concludes that this is the most relevant consideration with respect to this factor

Factor three, whether the payments at issue were tendered in a different manner than the historical payments, also weighs in favor of MDE as neither side has proffered any evidence to suggest that this may have been the case. The undisputed evidence shows that in the five years leading up to the Petition Date, the Debtors consistently paid the Permit Fee and the Asbestos Fee on or around the due date. *See* Def.'s Br. ¶ 10. The Report Fee, which was due upon receipt of the invoice, was always paid approximately thirty days after receipt.

The 2011 Permit Fee was paid just two days after the due date, and this timing is entirely consistent with the Debtors' historical payment patterns. Irons Declaration, Ex. 10. The same is true for the Asbestos Fee as the fee sought to be avoided was paid 24 days before the due date. Anderson Declaration, Ex. 12. Moreover, the tables in the Facts section demonstrate a remarkably consistent payment pattern with respect to the Environmental Fees. Virtually every Permit Fee going back five years was paid approximately sixty days post-invoice. The Asbestos Fee was paid approximately eighty days after the letter while the Report Fee was paid approximately thirty days after the invoice. While the Trustee urges the Court not to group the fees separately for purposes of analyzing historical payment patters, the Court finds that it would be improper not to do so for the simple reason that the Permit Fee, the Asbestos Fee, and the Report Fee invoices all contained different due dates. It makes little sense to compare the payment patterns for a debt due upon receipt with a debt due sixty days after receipt. Because the time to payment remained remarkably consistent during the Preference Period, the Court finds that factor three weighs in favor of MDE.

Factor four, unusual actions by the debtor or creditor, also weighs in favor of MDE.  There were none.  As does factor five since there is no evidence that MDE attempted to exploit the Debtors' distressed financial condition or rushed to collect its debt.  These factors strongly weigh in favor of MDE. The Court therefore concludes that the transfers are protected by the ordinary course of business defense.

### 4. Contemporaneous Exchange

MDE next asserts that the Permit Fee and the Asbestos Fee were contemporaneous exchanges protected by section 547(c)(1).  Section 547(c)(1) serves as a bar to preference claims if a defendant can demonstrate that following the transfer, "(1) the preference defendant extended new value to the debtor, (2) both the defendant and the debtor intended the new value and reciprocal transfer by the debtor to be contemporaneous and (3) the exchange was in fact contemporaneous."  7 Collier on Bankruptcy ¶ 547.04[1] (16th ed. 2014); see also 11 U.S.C. § 547(c)(1).  The Third Circuit has articulated that "there must be some manifest desire by the parties that the exchange contemporaneously grant money or money's worth in new credit, goods, services, or property to the debtor in order to sustain a finding of intent."  *In re Spada*, 903 F.2d 971, 975 (3d. Cir. 1990) (citing *In re Prescott*, 805 F.2d 719, 728 (7th Cir. 1986)). Establishing intent is a fact-based inquiry that requires a court to examine the circumstances surrounding the underlying commercial transaction. *See id.*

### a.  Asbestos Fee

With respect to the Asbestos Fee, there is no dispute of material fact – the record clearly indicates that the Debtors' license to remove asbestos was set to expire on July 29, 2011.  Anderson Declaration, Ex. 9.  Upon receipt of the Asbestos Fee, MDE immediately renewed the Debtors' license.  This therefore satisfies the first prong of the test: extension of new value.  By remitting

14

payment, the Debtors expressed the intent to renew the license, thereby satisfying the second prong.  And finally, the exchange was contemporaneous as the license renewed as soon as the Debtors paid the fee.  As a result, the Asbestos Fee is shielded by section 547(c)(1).

### b.  Permit Fee

The Trustee argues that because air-emissions permits are issued for five year terms in Maryland, no new value was extended by MDE upon remittance of the Permit Fee.  Once again the Court rejects this assertion.  As noted above, the purpose of the Permit Fee was to enable the Debtors to continue operating the business.  Whether the applicable statute calls for automatic revocation or not, paying the Permit Fee allowed the Debtors to stay in business in 2011.  This constitutes a contemporaneous exchange for new value under the test above.

### 5.  De Minimis Exception

Section 547(c)(9) prohibits a trustee from avoiding a transfer if "the aggregate value of all property that constitutes or is affected by such transfer is less than $5,000."  11 U.S.C. § 547(c)(9).  MDE argues that the three transfers should not be aggregated and that on their own, the Permit Fee and the Asbestos Fee fall below the statutory threshold of $5,000. The Trustee asserts that the transfers must be aggregated as a matter of law.  Because "[t]he majority view of the cases to construe Section 547(c)(8) hold that the transfers may be aggregated for purposes of meeting the monetary floor provided in Section 547(c)(8)," the Court sees no reason to depart from this precedent.  *Transcon. Refrigerated Lines, Inc. v. Dantone (In re Transcon. Refrigerated Lines, Inc.*), 438 B.R. 520, 522 (Bankr. M.D. Pa. 2010) (citing cases).  Having already ruled in favor of the Defendants on the prior two preference defenses, the Court sees no need to depart from the majority rule.

**6.  28 U.S.C. § 959(b)**

Having already determined that the Court will grant MDE's motion for summary judgment, the Court will briefly discuss the remaining issues.  MDE argues in the alternative that if the Trustee were to avoid the three transfers, doing so would render the Debtors in violation of Maryland law for the year 2011.  More specifically, because MDE may revoke an entity's license for failure to pay an Environmental Fee, MDE argues that clawing back the Environmental Fees would give the Debtors a free pass to operate without a permit – a direct violation of Maryland law.  Such a violation would run counter to section 959(b).  Section 959(b) provides:

> Except as provided in section 1166 of title 11, a trustee, receiver or manager appointed in any cause pending in any court of the United States, including a debtor in possession, shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated, in the same manner that the owner or possessor thereof would be bound to do if in possession thereof.

28 U.S.C. § 959(b).

However, even though section 959(b) prohibits the Debtors from operating without applicable environmental licenses, section 525(a) of the Code bars a governmental entity from revoking a license "solely because such bankrupt or debtor is or has been a debtor under this title . . . or has not paid a debt that is dischargeable in the case under this title or that was discharged under the Bankruptcy Act."  11 U.S.C. § 525(a).  Under this provision of the Code, MDE would be prohibited from revoking the Debtors' license to operate *solely* because the Debtors failed to pay the 2011 Environmental Fees, assuming such fees are dischargeable.  The Court concludes that these fees are in fact dischargeable.  In general, all pre-petition debts are dischargeable unless carved out by section 523(a) of the Code.  Because MDE has not asserted that the Environmental Fees fall under a specific exception to the discharge rule, MDE would have been prohibited from revoking the Debtors' license to operate had it failed to pay the Environmental Fees.  Therefore,

because section 523(a) prohibits MDE from revoking the license on this basis alone, it would have been a legal impossibility for the Debtors to operate without a license post-petition solely because they hadn't paid the Environmental Fees.

### 7. Sovereign Immunity

MDE's final assertion is that the doctrine of sovereign immunity insulates a state entity from liability in situations such as these.  The Supreme Court held that sovereign immunity is not a bar to preference actions against state agencies in *Katz.*  The Court must therefore reject MDE's sovereign immunity argument.  *Cent. Va. Cmty. College v. Katz*, 546 U.S. 356, 359 (2006) ("Relying in part on our reasoning in *Hood*, we reject the sovereign immunity defense advanced by the state agencies").

### CONCLUSION

For the foregoing reasons, the Court is granting MDE's motion for summary judgment and denying Trustee's motion for summary judgment.  An appropriate order will issue.

Wilmington, Delaware
Dated:  August 4, 2016

_____
KEVIN GROSS, U.S.B.J.

17